48 F.3d 1227
NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
 GENERAL TEAMSTERS, WAREHOUSEMEN AND HELPERS UNION, LOCAL
890, Plaintiff-Appellee,
v.
NATIONAL REFRACTORIES & MINERALS, a corporation, Defendant-Appellant
 No. 93-16453.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Dec. 14, 1994.
Decided Feb. 23, 1995.
 
 Before: HUG, CANBY, and KLEINFELD, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 The issue in the present case is whether the district court erred by entering summary judgment in favor of General Teamsters, Warehousemen and Helpers Union, Local 890 ("the Union") on its claim that arbitration is required to resolve a grievance with National Refractories & Minerals ("the Company"). We agree with the district court that arbitration is required in this case and therefore affirm.
 
 FACTS
 
 3
 The Company is in the business of, among other things, selling magnesia. Until recently, the Company produced its own synthetic magnesite. National Refractories & Minerals entered into a collective-bargaining agreement ("CBA") with General Teamsters, Warehousemen and Helpers Union, Local 890. Articles IX A and B, and XXV of the CBA require the Company to use union workers at its facility and to use nonunion workers only for work or services not available in the Company's work force. Further, the agreement provides that if the Company contracts out, it must do so with employers who pay their employees not less than union wages and give them benefits and working conditions similar to union employees. The CBA's arbitration clause is drafted in very broad language, requiring arbitration of "any disagreement or dispute between the parties."
 
 
 4
 In an effort to reduce what it perceived as excessive production costs, the Company decided to import natural magnesite from China. This decision arguably resulted in the partial closure of the Company's manufacturing site and the layoff of some union workers. The Union filed a grievance protesting the Company's actions, claiming that the Company's decision violated Article IX and Article XXV of the CBA. The Union sought arbitration of the grievance under the terms of the CBA. The Company, for its part, denied the grievance and refused to submit the dispute to arbitration. Its position is that the decision was one reserved to management under Article IV of the CBA and not subject to arbitration. The Union filed an action in federal court seeking to compel the Company to submit the dispute to arbitration. The district court, ruling only on whether the dispute was arbitrable, granted summary judgment in favor of the Union.
 
 I.
 
 5
 We review de novo a district court's grant of summary judgment. Jesinger v. Nevada Fed. Credit Union, 24 F.3d 1127, 1130 (9th Cir.1994). On a motion for summary judgment, the moving party bears "the initial responsibility of informing the district court of the basis for its motion." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The moving party must demonstrate that no genuine issue of material fact exists for trial. Id. at 322. Once the moving party demonstrates there is no genuine issue of material fact, the nonmoving party must designate "specific facts showing that there is a genuine issue for trial." Id. at 324. We review decisions regarding the scope of an arbitration clause de novo. Christensen v. GBC, 952 F.2d 1073, 1076 (9th Cir.1991).
 
 
 6
 Section 301 of the Labor Management Relations Act permits the federal courts to compel an employer to arbitrate a grievance where the relevant CBA contains a mandatory arbitration process to resolve disputes between the parties. See Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 450-51 (1957). Federal labor policy clearly favors resolution of labor disputes through arbitration. The United States Supreme Court has stated "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." AT & T Technologies v. Communication Workers, 475 U.S. 643, 650 (1980) (citations omitted).
 
 
 7
 Our own circuit opinions have emphasized the strong presumption of arbitrability when the arbitration clause, like this one, is written in broad and general terms. See Westinghouse Hartford Co. v. Hanford Atomic Metal Trades Council, 940 F.2d 513, 517 (9th Cir.1991). Indeed, where the clause is so broad that it appears the parties have committed all disputes to arbitration, "only an express exclusion of a particular grievance or 'the most forceful evidence of a purpose to exclude the claim' from arbitration will avoid referral of a dispute to arbitration." Christensen v. General Bldg. Contractors, 952 F.2d 1073, 1077 (9th Cir.1991) (citations omitted). In determining whether a claim is arbitrable, we "look only to the contract's arbitration clause, rather than to the substantive provisions of the agreement" and we will not rule on the potential merits of the underlying claims. Id.
 
 
 8
 The "dispute" in the present case is whether the company violated the terms of the CBA when it decided to import natural magnesite from China rather than continue manufacturing its own synthetic material. Whether the decision violates Article IX or Article XXV of the CBA, as the Union contends, or is an exclusive management decision under Article IV of the CBA, as the Company contends, requires an interpretation of the CBA.
 
 
 9
 The very broad arbitration clause of Article XXI of the CBA, which covers "any disagreement or dispute between the parties," may be limited by the subsections of that article to matters that may be brought before the Joint Committee on Contract Administration. Even so, Article XXI(C) makes it clear that this includes "the power to interpret and enforce the agreement." It is clear that the dispute requires an interpretation of the agreement, and thus is subject to the arbitration clause of Article XXI.
 
 
 10
 The Company's arguments that the court should look to other provisions of the CBA to find an implied intent to exclude the dispute from the broad provisions of the arbitration clause, or to look to the collective-bargaining history, are unpersuasive. The Supreme Court made it clear in AT & T Technologies, as previously stated, that an order to arbitrate "should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." 475 U.S. at 650. That surely cannot be said in this case.
 
 
 11
 The Company's reliance on First Nat'l Maintenance Corp. v. NLRB, 452 U.S. 666 (1981) is misplaced. That case involved a question of whether a plant closure decision was a mandatory subject of bargaining. The question here is whether a dispute under an existing collective-bargaining agreement is subject to arbitration. Management may not have a statutory duty to bargain about a subject, and yet may have entered into a collective-bargaining agreement that relates to that subject and requires mandatory arbitration to interpret the contractual provisions. The First National decision is therefore not relevant to this case.
 
 CONCLUSION
 
 12
 The decision of the district court granting summary judgment in favor of Local 890 on its action to compel National Refractories & Minerals to arbitrate the present dispute is affirmed. The Union's request for attorneys' fees and double costs is denied.
 
 
 13
 AFFIRMED.
 
 KLEINFELD, Circuit Judge, dissenting:
 
 14
 I respectfully dissent.
 
 
 15
 In my view, the presumptions and rules of construction do not point one way or the other in this case, because they conflict. On the other hand, as the majority correctly points out, arbitration is favored and doubts should be resolved in favor of coverage. On the other hand, a company waives its right not to bargain over non-mandatory subjects only by "clear and unmistakable language." Metropolitan Edison Co. v. National Labor Relations Board, 460 U.S. 693, 708 (1983). A decision whether to shut down part of its business is not among the issues for which Congress has mandated collective bargaining. First Nat'l Maintenance Corp. v. National Labor Relations Board, 452 U.S. 666, 686 (1981). Although the majority is correct that the arbitration clause must be read broadly, "the management prerogative clause should also be carefully scrutinized to minimize the potential for encroachment upon areas of exclusive management responsibility." International Union United Automobile, etc. Workers v. Lester Engineering Co., 718 F.2d 818, 823-24 (6th Cir.1983).
 
 
 16
 The majority errs, I think, in concluding that arbitrability is itself to be decided by the arbitrators. The district court is required to decide arbitrability independently, and we are required to review the summary judgment de novo, based on our interpretation of the agreement. "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." AT & T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 648 (1986) (internal quotations omitted). We are required to interpret the collective bargaining agreement to decide whether the parties intended to arbitrate grievances of the kind at issue. Id. at 651.
 
 
 17
 The arbitration clause says "any," as the majority correctly points out, so if our task were limited to construing the arbitration clause, any dispute whatsoever between union and management would be arbitrable. It is well established that even frivolousness is no barrier to arbitrability. Building Materials and Constr. Teamsters Local No. 216 v. Granite Rock Co., 851 F.2d 1190, 1194 (9th Cir.1988). Without even frivolousness as a limitation, and with a contract providing for arbitration of "any disagreement or dispute," there would be no barrier to arbitration of anything.
 
 
 18
 But that is absurd. Any claim can be articulated as a violation of the collective bargaining agreement, if even frivolousness is no barrier. The vice president's compensation package; whether the president gets the corner office and best parking spot; whether executives get private washrooms down through the vice president level; whether management should borrow money from one bank or another, or issue preferred stock or subordinated debentures, would all be arbitrable. So would whether the company buys a dolomite quarry, or sells one. So would whether the company stays in business.
 
 
 19
 The company did not, by agreeing to collective bargaining, turn over its entire management to a panel of three company and three union appointees. The way to avoid the absurd construction is by reading the entire contract, not just one section, and to read it all in light of the purposes it was designed to accomplish.
 
 
 20
 The "any dispute" language was put into the contract to serve a purpose. In the context of a collective bargaining relationship, the language implies disputes over issues which are intended by the parties to be the subject of collective bargaining. We know that "any" does not mean, literally, "any," because the contract expressly carves out a list of management prerogatives which are not to be infringed by collective bargaining or arbitration.
 
 
 21
 The contract expressly excludes from collective bargaining and arbitration decisions including the one at issue in this case, in section B(2) of the management autonomy section of the agreement:
 
 Article IV--Management Responsibilities
 
 22
 A. The Employer shall determine the competency and fitness of prospective Employees and the satisfactory performance of work by any Employee, and may discharge any Employee whose work is unsatisfactory or who fails to observe the safety precautions or other rules and regulations prescribed by the Employer for health, safety, and protection of its Employees.
 
 
 23
 1. Any Employee, except a probationary employee, who is aggrieved by the operation of this Article, may proceed as specified under Article XXI--GRIEVANCE AND ARBITRATION of the Agreement.
 
 
 24
 B. The number of persons to be employed is also at the discretion of the Employer, and the fact that certain classifications and rates are established does not mean that the Employer must assign persons to such classifications or staff any particular part of the Plant that happens to be on the site, unless the Employer has need of Employees in such classifications.
 
 
 25
 1. No Employee shall be required or permitted to work alone on any work where the fact that he is working alone will constitute a safety hazard.
 
 
 26
 2. The Employer shall not be hindered or prevented from using any type or quantity of machinery, materials, or appliances; nor shall the Union attempt to regulate production at any of the plants or quarry.
 
 
 27
 3. The Employer shall make every reasonable effort to avoid the use of materials, supplies, and equipment which will tend to cause injury to the health of the workmen; and specifically, will not use red lead or chromate of lead for spray painting.
 
 
 28
 Section (B)(2) controls. The company is entitled to buy the Chinese magnesite, and it is entitled to discontinue production of the commercially obsolete synthetic substitute at its Natividad and Magnesia plants. It expressly and specifically carved this area of autonomy out of the collective bargaining relationship in Section (B)(2).
 
 
 29
 If the words leave room for doubt, that doubt is resolved by considering the purposes behind them. The purpose of the contracting out provision is generally to prevent the company from diverting work from union labor in its employ to labor outside the bargaining unit. The purpose of the management prerogatives provision is to reserve essential aspects of the conduct of the business for exclusive management control, in order to protect the stockholders of the company from union demands which might put it out of business.
 
 
 30
 The Supreme Court has decided that a company has no duty to bargain collectively about its decision "whether to shut down part of its business." First Nat'l, 452 U.S. at 686. A decision "involving a change in the scope and direction of the enterprise, is akin to a decision whether to be in business at all." Id. at 677.
 
 
 31
 The facts in this case, and the contract language, make it like First National. The company used to make synthetic magnesia from dolomite. That is now a waste of time and money. The company is not buying what it used to make from a source outside the bargaining unit. The industry has changed, because of the commercial emergence of China. China sells natural magnesite which is cheaper and better than the synthetic imitation which the company used to make. The part of the company's business which formerly made the synthetic has been shut down. They might as well be making girdle stays of baleen. The First National decision, and the management responsibilities section of the contract, protect the company from having its present workers drain its resources away from its shareholders and its future workers for this commercially pointless exercise.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3